UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA,

-against-

WILLIAM SCOTT,

                                    Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _6/28/2021____

20 Cr. 332 (AT)

**OPINION
AND ORDER**

ANALISA TORRES, District Judge:

Defendant, William Scott, moves for an order dismissing the indictment on the ground that it violates his right to a representative jury under the Fifth and Sixth Amendments to the Constitution, and the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq*. (the "JSSA"). Def. Mot., ECF No. 17; Def. Mem. at 1, ECF No. 19. For the reasons stated below, the indictment is DISMISSED without prejudice.

## BACKGROUND

I.    Southern District of New York Jury Selection Procedure

The Southern District of New York (the "Southern District") embraces Bronx, Dutchess, New York, Orange, Putnam, Rockland, Sullivan, and Westchester Counties. 28 U.S.C. § 112(b). The court sits in Manhattan, White Plains, and Poughkeepsie. *Id.*; *About the District*, U.S. District Court: Southern District of New York, https://www.nysd.uscourts.gov/about (last visited June 28, 2021). Grand juries are convened and jury trials take place in the courthouses located in Manhattan and White Plains.

The Southern District creates a separate jury "wheel" for each of its two divisions pursuant to the Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York (Feb. 13, 2009) (the "Jury Plan"),

https://nysd.uscourts.gov/sites/default/files/pdf/juryplan_feb_2009.pdf, which was drafted according to the JSSA.  Under this plan, jury venires are constructed as follows.  First, the Clerk of Court or a deputy (the "Clerk") compiles a roster of all individuals whose names appear on the voter registration list of each relevant county.  Jury Plan § III.A.  From this roster, a number of people—whatever is "deemed sufficient for a four-year period"—is chosen at random.  *Id.*  The selected names are placed on "[m]aster [w]heel[s]," *id.*, which are refilled every four years.  *Id.* § III.B.  Each county must be proportionally represented on the master wheels.  *Id.* § III.A.

When necessary, the Clerk chooses names randomly from the master wheel, and mails those individuals a questionnaire regarding their eligibility and availability for jury service (the "Eligibility Questionnaires").  *Id.* § III.D.  When the Eligibility Questionnaires are returned, those persons deemed eligible from their responses are placed on a "qualified wheel."  *Id.*  Petit and grand jury venires are then constituted from a random selection of those on the qualified wheel.  *Id.* § III.F.

The Jury Plan provides for two separate master wheels.  Names are drawn from Bronx, New York, Putnam, Rockland, and Westchester Counties (the "Manhattan Division") to create a master wheel for the Manhattan courthouses.  *Id.* § III.C.  Names are drawn from Dutchess, Orange, Putnam, Rockland, Sullivan, and Westchester Counties (the "White Plains Division") to create a master wheel for the White Plains courthouse.  *Id.*  Therefore, Putnam, Rockland, and Westchester Counties (the "Overlapping Counties") are included in both divisions.  Each division constructs its own qualified wheel from its master wheel.  *Id.* § IV.B.

In practice, the White Plains Division's jury selection process deviates from the Jury Plan in several respects.

First, the White Plains Division does not include inactive voters on the voter registration lists of five counties: Orange, Putnam, Rockland, Sullivan, and Westchester. Martin Aff. ¶ 24, ECF Nos. 20–21. Thus, the names of those inactive voters do not appear on the lists the Clerk draws from to create the White Plains Division master wheel (the "Inactive Voter Exclusion"). *Id.* However, Dutchess County inactive voters are included on that county's list. *Id.* Inactive voters are registered voters who have been flagged, by proxy identification methods, as having moved from their voting address, such as when a county's board of elections sends mail to a voter that is then returned as undeliverable, or the Department of Motor Vehicles so informs the board. *See Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285, 290 (S.D.N.Y. 2020). When a voter is marked as inactive, the county's board of elections mails an address confirmation request to the voter. *Id.* To be reinstated, a voter can either reply to the confirmation notice or cast a valid affidavit ballot in a federal election. *Id.* at 291. A failure to vote for four years results in the state cancelling the voter registration. *Id.* In an unrelated case, another court in this district found that tens of thousands of voters in New York state were incorrectly marked as inactive. *Id.* at 293–98.

Second, the number of individuals selected from the Overlapping Counties for each division's master wheel is prorated, but in the White Plains Division, this method of proration causes fewer individuals to be chosen from the Overlapping Counties.[1] Martin Aff. ¶¶ 34–35; Gov't Opp'n at 27–28, ECF No. 28; Siskin Rep. ¶ 13, ECF No. 28-1. Specifically, although one out of three voters from Dutchess, Orange, and Sullivan Counties is chosen for the master wheel, only one out of 4.5 voters from the Overlapping Counties is picked (the "Disproportionate Proration"). Martin Aff. ¶ 37.

---

[1] Defendant does not contend that this deviation is present in the Manhattan Division. Martin Aff. ¶¶ 35–36, ECF Nos. 20–21.

Third, due to a technical error, the zip codes of some voters from Dutchess, Orange, Putnam, and Sullivan Counties who use a mailing address different from their voting address are not listed on the master wheel. *Id.* ¶¶ 41–42. As a result, some voters did not receive Eligibility Questionnaires, and, therefore, were not considered for inclusion in the White Plains Division qualified wheel. *Id.* ¶¶ 42–43.

II.     Southern District of New York Demographics

The Southern District's demographic makeup is not uniform across the divisions. In the Manhattan Division, the jury-eligible population includes 20.92 percent Black or African American ("Black") individuals, and 28.06 percent Hispanic or Latino ("Latinx") individuals.[2] Martin Aff. ¶ 20. In the White Plains Division, however, the jury-eligible population is only 12.45 percent Black and 14.12 percent Latinx. *Id.* ¶ 21.

Within the White Plains Division, the counties also have a varied racial makeup. The Overlapping Counties' jury-eligible population is 13.71 percent Black and 15.20 percent Latinx, as compared to 10.30 percent and 12.29 percent, respectively, in the other three counties. *Id.* ¶ 40.

Defendant's grand jury was chosen from the White Plains Division's master and qualified wheels. The master wheel in this instance (the "Master Wheel") was drawn from the November 1, 2016 voter registration lists, and was 11.20 percent Black and 12.97 percent Latinx. Siskin Rep. ¶ 28. The qualified wheel formed from the Master Wheel (the "Qualified Wheel") was refilled on February 7, 2017, and was 8.76 percent Black and 10.48 percent Latinx. Martin Aff. ¶ 55. This data is summarized in the chart below.

---

[2] In using the terms Black and Latinx, the Court adopts the meanings ascribed by the parties' experts to the terms "Black or African American" and "Hispanic or Latino."



III. Defendant's Indictment and Procedural History

On June 30, 2020, a grand jury sitting in the White Plains courthouse returned an indictment alleging that on June 23, 2020, Defendant possessed ammunition as a previously convicted felon, in violation of 18 U.S.C. § 922(g)(1), in connection with a shooting in the Bronx. Indictment, ECF No. 2; Gov't Opp'n at 1, ECF No. 28. Pursuant to the Rules for the Division of Business Among District Judges for the Southern District of New York, which determine where cases are heard based on the location of the offense, Defendant's case was designated for Manhattan and assigned to this Court. Gov't Opp'n at 1; Local Rules of the United States District Court for the Southern and Eastern Districts of New York 117 (Oct. 29, 2018), https://www.nysd.uscourts.gov/sites/default/files/local_rules/rules-2018-10-29.pdf.

Defendant now moves to dismiss the indictment, arguing that his grand jury did not represent a fair cross section of the community, in violation of the Sixth Amendment and the equal protection clause of the Fifth Amendment, and that the grand jury selection process violated the JSSA. Def. Mot.

**DISCUSSION**

I.     <u>Defendant's Objections to the Jury Selection Process</u>

Defendant objects to seven jury selection processes, which he contends caused his grand jury to be unrepresentative, in violation of the Constitution and the JSSA.[3]

First, he challenges the Government's decision to seek an indictment from a White Plains Division grand jury. Def. Mem. at 11–12. Defendant argues that because of the differing racial makeup of each division, this choice led to the Master and Qualified Wheels being unrepresentative of Black and Latinx individuals, as compared to the Manhattan Division population. *Id.*

Second, Defendant objects to the use of voter registration lists as the sole source for the Master Wheel, alleging that because Black and Latinx people register to vote at a lower rate, they are underrepresented on the voter registration lists as compared to their presence in the White Plains Division population. *Id.* at 14; Martin Aff. ¶ 79.

Third, Defendant argues that because "there is reason to believe" that inactive voters in Orange, Putnam, Rockland, Sullivan, and Westchester Counties are disproportionately Black and Latinx, the Inactive Voter Exclusion creates jury wheels that have disproportionately fewer Black and Latinx individuals. Def. Mem. at 14–15.

Fourth, Defendant challenges the Jury Plan's refilling of the master wheels every four years. *Id.* at 13. This practice excludes people who reach the eligible voting age of eighteen or move into the district during the years between the refilling of the wheel. Defendant claims that in the White Plains Division, individuals ages eighteen to twenty—who are omitted from the

---

[3] Defendant does not allege that each of these processes violates each of the Fifth and Sixth Amendments and the JSSA; however, for clarity the Court lists all of the challenged processes together.

Master Wheel under the current practice—are disproportionately Black and Latinx, and, therefore, refilling at this rate results in underrepresentation of these groups. *Id.* at 13–14.

Fifth, Defendant objects to the Disproportionate Proration, Def. Mem. at 15, which led to fewer voters from the Overlapping Counties being considered for the Master Wheel. Defendant's expert calculated that the Disproportionate Proration caused 285,347 otherwise eligible people to be excluded. *Id.* Given that the Overlapping Counties have a higher percentage of Black and Latinx individuals, Defendant argues, this further resulted in the underrepresentation of these groups. *Id.*

Sixth, Defendant challenges the Clerk's failure to update the addresses gathered for the Master Wheel. *Id*. at 12–13. Over the life of the Master Wheel, voters moved and the addresses obtained at the inception of the wheel became stale, causing some Eligibility Questionnaires to be returned as undeliverable. *Id.* This gave rise to the exclusion of people who had moved between residences within the White Plains Division. *Id.* Defendant claims that Black and Latinx voters disproportionately fall into this category, which led to their underrepresentation on the Master and Qualified Wheels. *Id.*

Finally, Defendant objects to the jury selection process because a technical malfunction caused the omission of the zip codes of some individuals from Dutchess, Orange, Putnam, and Sullivan Counties, thus preventing them from receiving Eligibility Questionnaires, which excluded them from the Qualified Wheel. *Id.*

## II.    Sixth Amendment

### A.    Legal Standard

The Sixth Amendment guarantees a jury "chosen from a fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975); *see also* 28 U.S.C. § 1861 ("It is

the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.").

In order to prove that his right to a jury that fairly represents the community has been violated, a defendant must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). As opposed to the equal protection claim discussed *infra* Part III, discriminatory purpose on the part of the Government is not required for a Sixth Amendment claim. *United States v. Biaggi*, 909 F.2d 662, 677 (2d Cir. 1990).

### B.     Cognizable Group

It is undisputed that Black and Latinx people are distinctive groups, meeting the first prong of the *Duren* test. *See United States v. Jackman*, 46 F.3d 1240, 1246 (2d Cir. 1995).

### C.     Underrepresentation in the Community

*Duren*'s second prong requires a comparison between the jury wheel and a "community" to determine if the representation is fair and reasonable. *Duren*, 439 U.S. at 364. To conduct this comparison, the Court must first determine: (1) the proper group to treat as the one from which juries are drawn—the Master Wheel or Qualified Wheel; (2) the proper community to which to compare that wheel—the entirety of the Southern District, the White Plains Division, or the Manhattan Division; and (3) the proper method of comparison. The Court addresses these questions first, then proceeds to the comparison itself.

1. Threshold Determinations

a. Master or Qualified Wheel

The choice of the Master Wheel or the Qualified Wheel as the comparator depends on which jury selection process is challenged. Though the Second Circuit has stated that "the relevant jury pool may be defined by: (1) the master list; (2) the qualified wheel; (3) the venires; or (4) a combination of the three," *United States v. Rioux*, 97 F.3d 648, 657 (2d Cir. 1996), it has not articulated how a court should select one of these options. In fact, the variation among Second Circuit precedent implies that there is no settled rule. *See id.* at 657 (noting the parties agreed on using the qualified wheel); *Jackman*, 46 F.3d at 1246 (suggesting, where the defect identified was how a "picking list" was created by combining different sets of qualified wheels, that the correct pool would be a central picking list created from the qualified wheels); *Biaggi*, 909 F.2d at 677 (using, without discussion, the master wheel); *United States v. LaChance*, 788 F.2d 856, 867–68 (2d Cir. 1986) (implying use of the qualified wheel would be correct).

The Second Circuit's decisions suggest that, when choosing a wheel as a comparator, courts should look to the "context of the systematic defect identified by the defendant," that is, "[t]he identified systematic defect defines . . . the particular pool." *United States v. Rioux*, 930 F. Supp. 1558, 1565–69 (D. Conn. 1995) (surveying Second Circuit and Supreme Court decisions); *United States v. Allen*, No. 20 Cr. 366, 2021 WL 431458, at *5 (S.D.N.Y. Feb. 8, 2021). The Court should examine the stage of the jury selection process affected by the identified defect. *Rioux*, 930 F. Supp. at 1567. Therefore, where the Second Circuit considered a challenge to the use of voter registration lists to construct the master wheel, the relevant wheel was the master wheel. *Biaggi*, 909 F.2d at 677. Where the objection related to the Eligibility Questionnaires, the Second Circuit referred to the qualified wheel. *Rioux*, 97 F.3d at 657–58.

The Court considers, therefore, each of the jury selection processes which give rise to an alleged Sixth Amendment violation. The Inactive Voter Exclusion, refilling the master wheel every four years, and the Disproportionate Proration, impacted only the creation of the Master Wheel, and had no bearing on the construction of the Qualified Wheel. The use of voter registration lists affected the creation of the Master Wheel. *Biaggi*, 909 F.2d at 677. Therefore, for these challenges, the Court shall use the Master Wheel as the comparator. However, the failure to update voters' addresses based on undelivered Eligibility Questionnaires relates only to the construction of the Qualified Wheel. For this challenge the Court uses the Qualified Wheel as the comparator. *Rioux*, 97 F.3d at 657.[4]

> b. Relevant Community

The next issue debated by the parties is which community to use as a comparator: that of the Southern District as a whole, the Manhattan Division, or the White Plains Division. The Court concludes that the correct comparator is the White Plains Division's jury-eligible population.

The Second Circuit has made clear that when considering a division-specific wheel, the correct comparator is not the entire district. *United States v. Bahna*, 68 F.3d 19, 24 (2d Cir. 1995) ("Where a jury venire is drawn from a properly designated division, we look to that division to see whether there has been any unlawful or unconstitutional treatment of minorities."); *see also United States v. Plaza-Andrades*, 507 F. App'x 22, 26 (2d Cir. 2013); *LaChance*, 788 F.2d at 867–68 (noting, in considering a challenge to a grand jury, that using the

---

[4] As discussed *infra* note 8, the Government's decision to seek an indictment for Defendant in the White Plains Division cannot be challenged as part of the jury selection process under the Sixth Amendment.

entire district as a comparator to a division-specific wheel would have been in error).[5] Therefore, the Southern District as a whole is not the proper comparator.

Although the caselaw states that divisions, rather than districts, are the correct community, ambiguity remains regarding how to analyze a grand jury impaneled in a division different from where the case is to be tried. Courts in this Circuit have not addressed this issue specifically. *Bahna*, 68 F.3d at 23 (stating in dicta that "as a general rule, selections [of grand and petit juries] are made from the area surrounding the courthouse where the case is to be tried," but not examining whether this "general rule" should apply in this situation); *United States v. Kenny*, 883 F. Supp. 869, 874 (E.D.N.Y. 1995) ("[T]here appears to be no dispute that, *generally*, the term [community] refers to the district—or division, when a district has been so divided—where the trial is to be held." (emphasis added)); *United States v. Johnson*, 21 F. Supp. 2d 329, 334–35 (S.D.N.Y. 1998). These cases, therefore, offer only limited guidance.

The Court thus looks to the JSSA, which codifies the Sixth Amendment's fair cross-section requirement as a right "to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. Defendant interprets the final clause to mean "wherein the [*trial*] court convenes," arguing that the correct comparator community is the Manhattan Division. Def. Reply at 4, ECF No. 30 (emphasis added). The Court disagrees.

---

[5] Defendant contends that the White Plains Division was not a "properly designated division" under *Bahna*, because Defendant should have been indicted in the Manhattan Division. Def. Reply at 4, ECF No. 30. However, in context, *Bahna*'s discussion of a division being "properly designated" is referring to an area being properly divided by the judiciary into a division under a jury selection plan, not whether a defendant's case was properly assigned to a division. *Bahna*, 68 F.3d at 24.

Defendant cites no Second Circuit caselaw with respect to choosing between divisions for *grand* juries. However, the Court finds instructive an out-of-circuit decision, *United States v. Cates*, 485 F.2d 26 (1st Cir. 1974), which is analogous.[6]

Guy Cates was indicted in the Southern Division of Maine, then arraigned in the Northern Division, where the alleged offenses were committed. *Cates*, 485 F.2d at 27. The district court dismissed the indictment on the theory that the grand jury, drawn from the Southern Division, was not a fair cross section of the Northern Division, which drew its grand jury from different counties. *Id.* The First Circuit reversed, holding that "the [JSSA] means no more than that when the court convenes to impanel a grand jury, the grand jurors shall be drawn from the district or surrounding division, and that when later the trial court convenes—perhaps in a different division—the petit jurors must come either from the district or from the division wherein the court is then convened." *Id.*

To reach this conclusion, the First Circuit examined the language of the JSSA, and rejected the lower court's holding that "wherein the court convenes" means "wherein the *trial* court convenes." *Id.* (emphasis added). The First Circuit observed that, "[c]ourts convene for the purpose of impanelling grand juries as well as conducting trials." *Id.*

Moreover, the First Circuit found the district court's interpretation "particularly questionable," because it would read into the federal statutes and rules a venue requirement that does not exist. *Id.* at 27–28. The JSSA is intended to do no more than "provide improved

---

[6] *Cates* differs because at that time, the District of Maine was statutorily divided into two divisions. *See* Act of June 5, 1948, ch. 646, 62 Stat. 881, *amended by* Pub. L. No. 95-573, § 2, 92 Stat. 2458 (1978). The Southern District's divisions, by contrast, are the product of the Jury Plan, rather than of statute. Jury Plan; *United States v. Gottfried*, 165 F.2d 360, 364 (2d Cir. 1948); *cf.* 28 U.S.C. § 112(b) (dividing the Southern District into designated places of holding court, rather than divisions). This distinction is not material for the purposes of a challenge to a jury's composition. 28 U.S.C. § 1869(e) (defining division "where there are no statutory divisions," as "such counties, parishes, or similar political subdivisions surrounding the places where court is held as the district court plan shall determine"); *see also Bahna*, 68 F.3d at 24.

judicial machinery so that grand and petit jurors would be selected at random by the use of objective qualification criteria to ensure a representative cross section of the district or division in which the grand or petit jury sits,"—thus addressing "the evil of discrimination." *Id.* The JSSA does not address from where the jurors can be drawn. *Id.* at 28 ("Selecting jurors where the court happens to convene is a matter quite apart from deciding whether it may convene at separate places for indictment and for trial."). The First Circuit reasoned:

> If the [JSSA] means that the court convenes only once and that convening must be where the offense was committed, it would have conflicted with the newly amended federal venue statute. Even if the [JSSA] means only that both trial and indictment must occur in the same division irrespective of where the offense occurred, it would substantially amend Rule 18 [the federal criminal venue rule] by tying the trial to the place of indictment rather than to the convenience of the defendant and the witnesses, and would advance no apparent legislative purpose or social policy associated with the [JSSA].

*Id.* at 28–29. Therefore, the First Circuit held that, "[i]n light of the legislative purpose, statutory history, and Rule 18," the JSSA requires only that "when the court convenes in a division for a sitting of the grand jury, the grand jurors must be randomly (and in other respects appropriately) selected from that division." *Id.* at 29. There is "no requirement that [the grand jurors] must come from the same division where a trial is later to take place or where the offense was committed." *Id.* Because Cates' jury was a fair cross section of the division in which he had been indicted, the First Circuit held that the indictment was lawful. *Id.* at 27.

In addition to this persuasive reasoning, the Court concludes that Defendant's reading of the JSSA contravenes other statutory schemes and Second Circuit precedent. It is well-settled that a court can divide a district into divisions, and those divisions need not be homogenous. *Bahna*, 68 F.3d at 24–25 (quoting *United States v. Gottfried*, 165 F.2d 360 (2d Cir. 1948) (Learned Hand, J.)). There is also no right to a grand jury from any particular division. *Cates*, 485 F.2d at 28. But if, as Defendant argues, the Sixth Amendment guarantees a defendant a

grand jury that is a fair cross section of the division in which the trial is held, the grand jury could only be convened there or in a demographically identical division. This cannot be squared with Congress' decision to not institute a grand jury venue requirement. *See* Fed. R. Crim. P. 18 advisory committee's note to 1944 adoption ("[T]he rule requires that only the trial be held in the division in which the offense was committed and permits other proceedings [such as grand juries] to be had elsewhere in the same district.")[7]; *see also id.* advisory committee's note to 1979 amendments (quoting *Cates* for the proposition that the JSSA does not create a venue requirement for trials).

The caselaw concerning petit juries is instructive. A defendant does not have a right to a trial in a specific division. *Plaza-Andrades*, 507 F. App'x at 26. A defendant is not, therefore, entitled to a jury drawn from the division where the crime was committed or the defendant resides. *Id.*; *United States v. Richardson*, 537 F.3d 951, 959 (8th Cir. 2008). However, once the trial division is set and the petit jury impaneled, that jury must represent a fair cross section of the trial location. *Jackman*, 46 F.3d at 1244.

Applying the same logic to grand juries, a defendant does not have a right to a grand jury in a particular division, including where he is tried. *Cates*, 485 F.2d at 28 ("There is no specific criminal venue requirement for grand juries."); *Soares v. United States*, 66 F. Supp. 2d 391, 395–97 (E.D.N.Y. 1999) (permitting, without comment, a defendant to have been indicted in the Brooklyn Division of the Eastern District of New York and tried in the Long Island Division), *aff'd sub nom. Bahna*, 68 F.3d 19. But once the grand jury is impaneled, it must represent a fair cross section of that division. 28 U.S.C. § 1861; *cf. Bahna*, 68 F.3d at 24 ("Where a [petit] jury

---

[7] Rule 18's requirement that trial take place in a specific division was later amended to permit trial in any division in the district. *See* Fed. R. Crim. P. 18.

venire is drawn from a properly designated division, we look to that division to see whether there has been any unlawful or unconstitutional treatment of minorities.").

Moreover, at least two courts outside of this district have considered fair cross-section challenges involving a defendant who was indicted and tried in different divisions, and have concluded, without extensive analysis, that the proper comparator is the community of the division where the grand jury was impaneled. *See United States v. Andrews*, No. 12 Cr. 100-1, 2014 WL 6841231, at \*3 (N.D. W. Va. Dec. 3, 2014); *United States v. Taylor*, 663 F. Supp. 2d 1157, 1165 (D.N.M. 2009).

Accordingly, the correct "community" against which to compare a jury wheel is that of the division in which the grand jury was convened, not where the trial is to take place. The Court, therefore, shall compare the Master and Qualified Wheels to the population of the White Plains Division.

c.      Method of Analysis

Finally, the parties disagree on the proper method of comparing the jury wheel and the division population. Courts have historically used three methods of statistical analysis to compare the jury pool and the community: (1) statistical decisional theory, which "calculates probabilities and measures the likelihood that underrepresentation could have occurred by sheer chance"; (2) the absolute disparity method, which measures the difference between the group's percentage in the community population and in the jury wheel; and (3) the comparative disparity approach, which measures "the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Rioux*, 97 F.3d at 655–56. Of these, in the Second Circuit, the absolute disparity method is the favored approach for Sixth Amendment claims. *Id*.

The Second Circuit has indicated, however, that the comparative disparity approach can be used in certain circumstances when: (1) the minority population is a "tiny percentage of the entire population," (2) the "skewed minority representation" results from something less "benign" than the use of voter registration lists to construct the wheel, and (3) there is "insufficient data" to conduct the absolute disparity analysis. *Id.* at 656 (citing *Jackman*, 4 F.3d at 1247). Though it is unclear whether this test is conjunctive or disjunctive, the Second Circuit in *Rioux* implied that underrepresentation resulting from a non-benign cause may be sufficient. *Id.* ("[The absolute disparity method] was acceptable *only* because the skewed minority representation resulted from something as benign as the use of voter registration lists to construct the jury wheel." (emphasis added)).

The Second Circuit has not set a specific threshold for establishing that a minority population is a "tiny percentage" of the whole population. *Rioux*, 97 F.3d at 656. *Rioux* deemed populations of 8.33 percent Black and 5.18 percent Latinx small enough to qualify for the comparative disparity analysis. *Id.* *Jackman* held that 6.34 percent and 5.07 percent were small enough; *Biaggi* concluded that 19.9 percent and 15.7 percent were too high. *Jackman*, F.3d at 1247; *Biaggi*, 909 F.2d at 678. In *United States v. Barlow*, a court in the Eastern District of New York determined that the relevant population of 8.9 percent African American males was too high to employ a comparative disparity analysis, and applied the absolute disparity method instead. 732 F. Supp. 2d 1, 33 (E.D.N.Y. 2010), *aff'd on other grounds*, 479 F. App'x 372 (2d Cir. 2012). Here, the White Plains Division population is 12.45 percent Black and 14.12 percent Latinx, roughly two to three times that of *Jackman* and *Rioux*. Martin Aff. ¶ 21; Siskin Rep. ¶ 19. The number of Latinx people is approximately the same as in *Biaggi*, and the amount of Black individuals is approximately two-thirds of *Biaggi*. Both numbers are considerably higher

than the percentage in *Barlow*. The Court cannot conclude, therefore, that the minority population here is a "tiny percentage" of the White Plains Division.

In the absence of binding authority from the Second Circuit regarding a strict definition of what causes are "benign," the Court can deduce some general principles from courts in this Circuit. Using facially neutral means to construct a jury pool is benign, even if, because of demographic patterns or other "private sector influences," these result in disproportionate representation. *United States v. Barnes*, No. 94 Cr. 112, 1996 WL 684388, at *6 (D. Conn. June 26, 1996); *Jackman*, 46 F.3d at 1247 (stating that the use of voter registration lists is benign); *Barlow*, 732 F. Supp. 2d at 33 ("There is no evidence that the jury pool is formed largely by the whims of the jury clerk or that the selection procedures at issue are apt to exclude wholesale segments of the population."). In addition, accidental exclusion, even of whole counties, may be benign if done "inadvertent[ly]." *Jackman*, 46 F.3d at 1247. However, exclusion effected with knowledge that the method of construction is unconstitutional is not benign. *Id.*; *Rioux*, 930 F. Supp. at 1577 (concluding the district's failure to adopt a magistrate judge's recommendations to make the jury pool more representative was benign because "the reports of a magistrate judge monitoring a jury selection system are not the equivalent of a formal finding that a particular jury selection system is unconstitutional").

Therefore, facially neutral means of construction, such as the use of voter registration lists, refilling the master wheel every four years, and the failure to update an individual's address based on undelivered Eligibility Questionnaires are considered benign. *Biaggi*, 909 F.2d at 677; *Barnes*, 1996 WL 684388, at *5–6. Moreover, the Inactive Voter Exclusion and Disproportionate Proration are also facially neutral, and, even assuming that they excluded full segments of the population from consideration for the Master Wheel, no court has yet found that

these processes violate the Sixth Amendment. *See Jackman*, 46 F.3d at 1247; *Rioux*, 930 F. Supp. at 1577; *cf. Common Cause/New York*, 432 F. Supp. 3d at 319 (finding that certain procedures regarding inactive voters violated the Fifth Amendment). The Court concludes, therefore, that any exclusion arising from the Inactive Voter Exclusion and Disproportionate Proration was "inadvertent" and thus "benign" for purposes of the *Rioux* test. *Jackman*, 46 F.3d at 1247.[8]

Finally, neither party has argued that there is insufficient data to conduct the necessary analysis. In *Jackman*, the nature of the challenged jury selection process resulted in unavailable demographic data. 46 F.3d at 1247–48. That is not an issue here, as both experts have performed calculations to determine the demographics.

Therefore, the *Jackson* exception does not apply, and the Court uses the absolute disparity method of comparison.[9]

### 2. Analysis

Now that the proper terms have been defined, the Court shall compare the Master Wheel to the White Plains Division population employing the absolute disparity method for all claims

---

[8] The Court concludes that the Government's decision to seek an indictment in the White Plains Division does not amount to a jury selection process challengeable under the Sixth Amendment. The Sixth Amendment concerns itself with a comparison of the jury, as constituted, to the community in which it is impaneled, 28 U.S.C. § 1861, and only becomes relevant after the location of the grand jury has been selected. Moreover, it does not require that a case be tried in the most representative community available. *United States v. Herbert*, 698 F.2d 981, 984 (9th Cir. 1983) (holding that it was not a denial of a defendant's Sixth Amendment right for him to be tried in a division which had fewer Native Americans where there was no evidence that Native Americans were systematically excluded within that division); *see also Plaza-Andrades*, 507 F. App'x at 26.

[9] The Court notes that the absolute disparity method has limitations and can overlook underrepresentation that cannot be explained by random chance. Michael O. Finkelstein, *The Application of Statistical Decision Theory to the Jury Discrimination Cases*, 80 Harv. L. Rev. 338, 357 (1966) (criticizing the Supreme Court's holding that a disparity of 10 percent did not show purposeful discrimination and finding that the likelihood of the jury at issue being convened due to random chance was one in "thousands of trillions"); *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1164 (9th Cir. 2014) ("[W]e conclude that it is appropriate to abandon the absolute disparity approach . . . in fair cross-section challenges."); *United States v. Allen*, No. 20 Cr. 366, 2021 WL 431458, at *8 (S.D.N.Y. Feb. 8, 2021) ("The Court notes that there are limitations to [the absolute disparity] method, especially for minority groups that constitute a small percentage of the population.").

except Defendant's challenge of the failure to update voters' addresses based on undelivered Eligibility Questionnaires, for which the Court shall compare the Qualified Wheel to the White Plains Division population.

Using these comparisons, the Court cannot conclude that there is substantial underrepresentation for the purposes of the Sixth Amendment. The White Plains Division population is 12.45 percent Black and 14.12 percent Latinx. Martin Aff. ¶ 21; Siskin Rep. ¶ 19. The Master Wheel is 11.20 percent Black and 12.97 percent Latinx. Siskin Rep. ¶ 28. Therefore, the absolute disparities are 1.25 percentage points for Black individuals, and 1.15 percentage points for Latinx individuals, *id.*, well below the ranges of 3.6 to 4.7 percentage points that the Second Circuit has found to be the lower limit of an unacceptable disparity. *Biaggi*, 909 F.2d at 677–78.

The Qualified Wheel is 8.76 percent Black, and 10.48 percent Latinx, resulting in an absolute disparity of 3.69 percentage points for Black people, and 3.64 percentage points for Latinx people. Martin Aff. ¶¶ 63–64; Siskin Rep. ¶ 3. Though at the lower limit of an unacceptable disparity in *Biaggi*, it still falls within the range found to be acceptable where the cause is "benign"—such as the failure to update voter addresses. *Rioux*, 97 F.3d at 658; *Barnes*, 1996 WL 684388, at *6 ("Private sector influences such as voting patterns, demographics, citizenship, fluency, and literacy which affect the jury selection process . . . are no less benign than the court's reliance on voter's lists in *Biaggi*.").

The Court holds, therefore, that for Sixth Amendment purposes Black and Latinx individuals were not substantially underrepresented on the grand jury that indicted Defendant. Because Defendant's claim fails on this prong, the Court need not address the third *Duren* prong.

Accordingly, Defendant has not met his burden under the *Duren* test to show that his Sixth Amendment rights have been violated. The motion to dismiss the indictment on Sixth Amendment grounds is, therefore, DENIED.

III.     Fifth Amendment

     A.     Legal Standard

Under longstanding Fifth Amendment precedent, "it is a denial of the equal protection of the laws to try a defendant of a particular race or color under an indictment issued by a grand jury . . . from which all persons of his race or color have, solely because of that race or color, been excluded by the State." *Castaneda v. Partida*, 430 U.S. 482, 492 (1977) (quoting *Hernandez v. Texas*, 347 U.S. 475, 477 (1954)). "While the earlier cases involved absolute exclusion of an identifiable group," the Supreme Court recognized in later cases that "substantial underrepresentation" of a group "constitutes a constitutional violation as well, if it results from purposeful discrimination." *Id.* at 493.

As an alternative to establishing this claim by demonstrating purposeful discrimination in the selection of a jury, a defendant may use "clear statistical evidence" to "raise a presumption of discrimination." *Rioux*, 97 F.3d at 659. In other words, direct evidence of discriminatory purpose is not the only way to make out an equal protection violation. The test is similar, but not identical, to the Sixth Amendment *Duren* test. A defendant must demonstrate "(1) a cognizable group is (2) substantially underrepresented and (3) that the selection procedure is not racially neutral." *United States v. Purdy*, 946 F. Supp. 1094, 1106 (D. Conn. 1996), *aff'd*, 144 F.3d 241 (2d Cir. 1998); *see also Alston v. Manson*, 791 F.2d 255, 257 (2d Cir. 1986). This showing gives rise to a presumption of discrimination. *Alston*, 791 F.2d at 257. The burden then shifts to the

Government to rebut the presumption by establishing that the underrepresentation is not due to purposeful discrimination. *Rioux*, 97 F.3d at 659.

B.    Cognizable Group

It is undisputed that Black people and Latinx people are cognizable groups for purposes of this claim.

C.    Substantial Underrepresentation

For challenges to underrepresentation on jury wheels under the Fifth Amendment, as opposed to the Sixth Amendment, courts may—and in fact, should—use alternative methods of comparison between the jury wheel and the community, particularly statistical decisional theory. *Id.*; *Alston*, 791 F.2d at 257–58.  A different mode of analysis is called for because of the difference in the nature of the violations under each Amendment.  Under the Sixth Amendment, a disparity creates a *per se* violation.  *Alston*, 791 F.2d at 258.  Under the Fifth Amendment, however, a disparity supports not only a finding of discriminatory effect, but also discriminatory purpose—an essential element of a Fifth Amendment challenge, but not required for a Sixth Amendment claim.  *Duren*, 439 U.S. at 368 n.26.  Because statistical decisional theory "reveals the possible role of chance" in the jury selection process, it is "ideally suited for shedding light on this issue." *Alston*, 791 F.2d at 258; *see also Villafane v. Manson*, 504 F. Supp. 78, 84 (D. Conn. 1980) ("[T]he problem with a test which focuses on the actual number of jurors is that rather than testing for intent it seems to be better designed to test for harm to the defendant.  It is designed to show how much difference the underrepresentation will make to the particular complaining defendant rather than to demonstrate and test the intent of the prosecuting [s]tate."), *aff'd*, 639 F.2d 770 (2d Cir. 1980).

Statistical decisional theory, also known as standard deviation analysis, measures the probability that underrepresentation of this extent would happen by chance. Defendant's expert conducted this analysis, and determined that the underrepresentation of either Black or Latinx individuals on the Qualified Wheel is more than three standard deviations from the White Plains Division population, which would occur by random chance less than 0.5 percent of the time. Martin Aff. ¶¶ 73–75. Put another way, the probability that this underrepresentation would come about by chance is approximately five in one thousand. The Government does not dispute these conclusions.

The Supreme Court has noted that, "as a general rule[,] if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." *Castaneda*, 430 U.S. at 496 n.17. Therefore, approximately this amount of deviation has been found to raise a presumption of discrimination. *See Villafane*, 504 F. Supp. at 87; *Hillery v. Pulley*, 563 F. Supp. 1228, 1244–45 & n.3 (E.D. Cal. 1983) (finding a difference of just over three standard deviations sufficient to raise a presumption of discrimination), *aff'd and remanded*, 733 F.2d 644 (9th Cir. 1984), *aff'd sub nom. Vasquez v. Hillery*, 474 U.S. 254 (1986); *cf. Moultrie v. Martin*, 690 F.2d 1078, 1084–85 (4th Cir. 1982) (reiterating that more than two or three standard deviations would be sufficient to raise a presumption of discrimination); *United States v. Donohue*, 574 F. Supp. 1269, 1279 (D. Md. 1983) (emphasizing that a standard deviation greater than three "would be significant"). The Government does not deny the statistical significance of this disparity, and merely offers potential benign explanations for it. Siskin Rep. §§ V.B–C. And, although the Government faults Defendant's model for not accounting for the specific challenged processes, it makes no statistical showing that incorporation of these other factors

would impact the statistical significance of the disparity generally. *Id.* § VI; *see also Biaggi*, 680 F. Supp. at 652 (analyzing the statistical significance of the racial underrepresentation without discussing specific causes).

The Court holds, therefore, that Defendant has carried his burden to demonstrate that Black and Latinx individuals are substantially underrepresented on the Qualified Wheel. Defendant does not, however, offer any evidence regarding underrepresentation in the Master Wheel. Therefore, the Court cannot draw conclusions regarding discrimination based on processes that affected only the Master Wheel.

### D. Selection Process

Finally, Defendant must show that the jury selection process was not "racially neutral[]" or "susceptible to abuse." *Biaggi*, 909 F.2d at 677 n.4. Courts have found processes not racially neutral where the "ineluctable effect" of the process identified as problematic "was to reduce the number of Black or Hispanic prospective jurors." *Purdy*, 946 F. Supp. at 1108. For instance, in *Alston*, the Second Circuit held that a Connecticut quota system where each town furnished a fixed number of jurors to the jury wheel, which "favored representation of smaller towns" although "a larger concentration of the black population in Connecticut lives in the more populated urban settings," was not racially neutral, because its "ineluctable effect" was to decrease representation of the Black population in the jury pool. *Alston*, 791 F.2d at 256–57.

Courts have found processes susceptible to abuse where they were "'capable of being applied in such a manner as practically to proscribe any group thought by the law's administrators to be undesirable,' or . . . 'provided a clear and easy opportunity for racial discrimination.'" *Purdy*, 946 F. Supp. at 1108 (first quoting *Smith v. Texas*, 311 U.S. 128, 130–131 (1940); then quoting *Alexander v. Louisiana*, 405 U.S. 625, 630 (1971)). For instance,

the Supreme Court determined that the "key-man system" of selecting jurors was "susceptible [to] abuse" because it was "highly subjective." *Castaneda*, 430 U.S. at 497. Under this method, a set of jury commissioners, known as key men, chooses as grand jurors qualified individuals from the community, generally "from those people with whom they [are] personally acquainted." *Cassell v. Texas*, 339 U.S. 282, 287–88 (1950); *Castaneda*, 430 U.S. at 497. This manner of selection granted key men the discretion to exclude potential jurors on the basis of their race, a practice the Court had previously noted was "capable of being applied in such a manner as practically to proscribe any group thought by the law's administrators to be undesirable." *Smith*, 311 U.S. at 131; *see also Alexander*, 405 U.S. at 631 (describing a similar system as "mak[ing] it easier for those to discriminate who are of a mind to discriminate").

Most of the challenged features of the White Plains Division jury selection process are racially neutral and not subject to abuse. It is well established that the use of voter registration lists is racially neutral. *Biaggi*, 909 F.2d at 677. Similarly, the Inactive Voter Exclusion is racially neutral, as Defendant offers no specific explanation to support his theory that inactive voters in Orange, Putnam, Rockland, Sullivan, and Westchester Counties are more often Black and Latinx. *See* Def. Mem. at 14–15. Because there is no evidence that the Inactive Voter Exclusion reduced the percentage of Black or Latinx individuals on the Master Wheel, the Court cannot conclude that it had an ineluctable discriminatory effect. Similarly, Defendant's unsupported claim that the failure to update voters' addresses based on undelivered Eligibility Questionnaires disproportionately affects Black and Latinx voters—because they move at a higher rate, and therefore "potentially might not receive qualification forms or summons[es]" at a higher rate, Martin Aff. ¶¶ 52, 81—amounts to speculation and does not demonstrate that the ineluctable effect of this failure was not racially neutral, *Rioux*, 930 F. Supp. at 1583. Defendant

concedes that some of this impact may be due to individuals receiving but not returning their Eligibility Questionnaires, which is not an inevitable result of not updating addresses. Martin Aff. ¶ 88. In addition, the practice of refilling the master wheel every four years does not establish a discriminatory purpose if the wheel was representative when created. *See Hamling v. United States*, 418 U.S. 87, 138 (1974) ("[I]f the jury wheel is not discriminatory when completely updated at the time of each refilling, a prohibited 'purposeful discrimination' does not arise near the end of the period simply because the young and other persons have belatedly become eligible for jury service by becoming registered voters.").

However, two of the challenged processes are racially non-neutral or susceptible to abuse. First, the Disproportionate Proration—the practice of drawing proportionally fewer voters from the Overlapping Counties—causes the Master Wheel to be made up of fewer individuals from counties with a higher percentage of Black and Latinx voters. This practice, therefore, parallels the facts of *Alston*, where the jury plan necessarily led to fewer jurors being selected from an area with a higher proportion of Black individuals. *Alston*, 791 F.2d at 256. Here too, as a result of the Disproportionate Proration, the White Plains Division "could not help but partially exclude" Black or Latinx people, making the Disproportionate Proration racially non-neutral. *Id.* at 257; *see also* Martin Aff. ¶¶ 74–75, 77, 83 (identifying the Disproportionate Proration as a potential cause of the statistically significant underrepresentation). However, the Disproportionate Proration directly affects the Master Wheel, and any impact the Disproportionate Proration has on the Qualified Wheel is a result of its impact on the Master Wheel. To raise an inference of discrimination as to the Disproportionate Proration, therefore, Defendant would have to demonstrate that the Master Wheel's underrepresentation is statistically significant. Because Defendant only shows that the Qualified Wheel is unrepresentative, he has

not met his burden. Martin Aff. ¶¶ 14, 74–75. Too many potential intervening factors arise in the formation of the Qualified Wheel from the Master Wheel to permit this inference.

Second, the Government's exercise of its unfettered authority to opt to present Defendant's case to a grand jury drawn from an unrepresentative White Plains Division wheel constitutes a jury selection process which is susceptible to abuse. The Government states that it is "common" for defendants whose cases end up being tried in the Manhattan Division to be indicted in White Plains,[10] but does not explain how or why it chooses one division over the other. Gov't Opp'n at 3. This practice predates the COVID-19 crisis: The Government cites examples which span over fifteen years. *Id.* Moreover, the Government's selection of a division is not constrained by court rules or statutes. *Id.* at 2–3. Because the White Plains Qualified Wheel underrepresents Black and Latinx individuals to a degree that is highly unlikely the result of chance, the Government was "provided a clear and easy opportunity" to discriminate, *Purdy*, 946 F. Supp. at 1108 (quotation marks and citation omitted), by choosing White Plains—a subjective decision-making process that echoes the suspect key-man system, *see Castaneda*, 430 U.S. at 497 (finding a jury selection process impermissible where it was "highly subjective"); *cf. Alexander*, 405 U.S. at 631.

The Government contends that the decision to indict a defendant in Manhattan or White Plains is not part of the jury selection process and, therefore, cannot constitute a Fifth Amendment violation. Gov't Opp'n at 20–21, 26 n.10. This argument misunderstands the difference between Fifth and Sixth Amendment claims. For the purposes of the Sixth Amendment, a defendant is entitled to a jury that, when constituted, represents a fair cross

---

[10] Defendant debates this point; his expert notes that in his work on over fifty federal jury challenges since 1997, this is the first case involving a grand jury and petit jury coming from different divisions. Def. Reply at 5; Martin Aff. ¶ 7.

section of the population of the district or division where the defendant is indicted or tried.  28 U.S.C. § 1861.  Therefore, the Government's selection of one locale over the other does not implicate the Sixth Amendment because it does not affect whether the grand jury is representative of the chosen community.

The Fifth Amendment, by contrast, grants a defendant the right to a jury from which members of a cognizable group (such as Black or Latinx people) have not been purposefully excluded.  *Castaneda*, 430 U.S. at 492–93.  Thus, the issue is whether, when selecting a jury, the Government intended to discriminate by keeping out members of that group.  *Alston*, 791 F.2d at 258; *see also Duren*, 439 U.S. at 367–68 (contrasting Fifth Amendment and Sixth Amendment claims).  Here, the Government faced a discretionary choice between jury pools in two divisions, one of which substantially underrepresented certain racial groups.  This "clear and easy opportunity" to discriminate is enough to render the process susceptible to abuse.  This is true even if the underrepresentation arose for permissible reasons and even if the underrepresentation does not give rise to a Sixth Amendment fair cross-section violation.  Defendant, therefore, has established a presumption of discriminatory purpose based on the Government's decision-making process.

E.     Government Rebuttal

The burden now shifts to the Government to rebut the presumption of discriminatory purpose with evidence "either that discriminatory purpose was not involved or that such purpose did not have a determinative effect."  *Duren*, 439 U.S. at 368 n.26.  The Government (1) neither challenges the statistical decisional theory analysis demonstrating a substantial underrepresentation of Black or Latinx individuals in the jury wheel from which Defendant's grand jury was drawn, nor the conclusion that it is highly improbable that the

underrepresentation was produced by chance; and (2) concedes that it is vested with the unfettered discretion to subjectively select an unrepresentative jury pool. Inexplicably, the Government offers no reason for its decision to indict *Defendant* in the White Plains Division. It does not argue, for example, that its decision in this case was made pursuant to some objective criteria or because of some non-discriminatory exigency. The Government merely states that, "amidst a global pandemic that suspended grand juries across the country, the Government sought and obtained an indictment from a federal grand jury in the [Southern D]istrict." Gov't Opp'n at 1. The Government does not say that the Manhattan Division grand jury was unavailable; in fact, a grand jury was convened there days before Defendant's indictment. Def. Reply, Ex. A, ECF No. 30-1. Of course, the COVID-19 pandemic or other factors may have given rise to non-discriminatory reasons to seek an indictment in White Plains, but the Government has provided none. The Government's silence when it comes to its decision-making in this case simply cannot overcome the presumption of discrimination raised by Defendant.

Nor does the Government claim that the Manhattan Division jury wheels are equally unrepresentative to support the argument that its decision had no determinative discriminatory effect. The Government, therefore, has failed to rebut the presumption of discriminatory purpose.

Accordingly, Defendant's motion to dismiss the indictment based on a violation of the Fifth Amendment is GRANTED.

IV.     Jury Selection and Service Act

        A.     Legal Standard

Finally, Defendant argues that the White Plains Division jury selection process violates the JSSA.  The JSSA permits a court to dismiss an indictment when "there has been a substantial failure to comply with the provisions of [the JSSA] in selecting the grand jury."  28 U.S.C. § 1867(d).  However, "[a] technical violation of the [JSSA's] detailed jury selection procedures does not constitute a substantial failure to comply with the statute."  *Rioux*, 930 F. Supp. at 1581. A "substantial failure" occurs when the violation "frustrates the policy objectives of the [JSSA], namely the random selection of jurors and the objective determination of juror disqualification, exemptions and excuses."  *Purdy*, 946 F. Supp. at 1104; *see also LaChance*, 788 F.2d at 870 (holding that whether a violation is technical or substantial depends on "the nature and extent of its effect on the wheels and venire from which a defendant's grand jury was derived").

The contours of the test in the Second Circuit for whether a violation of the JSSA is substantial have not been precisely drawn.  *Rioux*, 930 F. Supp. at 1579.  Generally, the test is the same as for Sixth Amendment claims.  *Rioux*, 97 F.3d at 660.  However, some cases imply that "[t]he statutory protections [of the JSSA] go beyond the remedy available under the Sixth Amendment."  *Jackman*, 46 F.3d at 1249 (Walker, J., dissenting); *Purdy*, 946 F. Supp. at 1104; *Rioux*, 930 F. Supp. at 1579; *United States v. Gruberg*, 493 F. Supp. 234, 246 (S.D.N.Y. 1979).

The suggestion in the *Jackson* dissent that non-random exclusion may be actionable under the JSSA independent of its effect on racial minorities has not been addressed by the Second Circuit.  However, other circuits have confronted the issue, and determined that a JSSA violation is "substantial" separately from a fair cross-section claim under *Duren* only if the challenged process violates one of the two principles of the JSSA: "(1) random selection of juror

names from the voter lists of the district or division in which court is held; and (2) determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only." *United States v. Bearden*, 659 F.2d 590, 600–01 (5th Cir. 1981); *United States v. Carmichael*, 560 F.3d 1270, 1277 (11th Cir. 2009); *United States v. Caballero*, 286 F. Supp. 3d 242, 249 (D. Mass. 2017). By contrast, "violations . . . that do not frustrate the random selection and cross section requirements and do not result in discrimination and arbitrariness do not constitute a substantial failure to comply." *United States v. Savides*, 787 F.2d 751, 754 (1st Cir. 1986); *see also Carmichael*, 560 F.3d at 1277.

The "random selection" principle of the JSSA, however, does not require statistical randomness. *Bearden*, 659 F.2d at 602 (quoting S. Rep. No. 891, 90th Cong., 1st Sess. 16 n.9 (1967)). "It is sufficient . . . if the plan adopts some system of selection that affords no room for impermissible discrimination against individuals or groups." *Id.*; *see also United States v. Awadallah*, 457 F. Supp. 2d 239, 242–43 (S.D.N.Y. 2006). Therefore, in considering challenges to jury plans under the JSSA because of violations of random selection, courts revert to the *Duren* test to determine if the lack of randomness resulted in impermissible discrimination. *See, e.g.*, *Bearden*, 659 F.2d at 602; *United States v. Fieger*, No. 07 Cr. 20414, 2008 WL 2202221, at *1 n.2 (E.D. Mich. May 23, 2008). If there is no discrimination, even in the face of disproportionate representation, there is no substantial violation of the JSSA, because its underlying purpose was not compromised. *See United States v. Gregory*, 730 F.2d 692, 699 (11th Cir. 1984).

Defendant alleges violations of the JSSA in (1) the decision to seek an indictment of "a Manhattan case in the White Plains Division," (2) the Inactive Voter Exclusion, (3) the Disproportionate Proration, and (4) the exclusion, due to a technical glitch, of some individuals

who provided an alternate mailing address when registering to vote.  Def. Mem. at 19–22.  The Court addresses each argument in turn.

B.      Decision to Seek an Indictment in the White Plains Division

Defendant contends that the Government's decision to seek an indictment in the White Plains Division violates the JSSA requirement that "names of persons residing in each of the counties, parishes, or similar political subdivisions within the judicial district or division are placed in a master jury wheel," because individuals from New York and Bronx Counties were not included in the Master Wheel.  *Id.* at 19 (quoting 28 U.S.C. § 1863(b)(3)).  However, as discussed *supra*, Defendant does not have a right to a grand jury drawn from the entire district, nor one drawn from the community where he will be tried or where the alleged offense took place, and the JSSA does not create such a right.  *Supra* § II.C.1.b; *United States v. Gluzman*, 154 F.3d 49, 50–51 (2d Cir. 1998) (holding a defendant tried in White Plains did not have a right to have jurors drawn from Bronx County).  Moreover, voters from New York and Bronx Counties are placed on the Manhattan Division master wheel, even if they are excluded from the White Plains wheel, thus satisfying the JSSA.  Therefore, this is not a substantial violation of the JSSA.

C.      Inactive Voter Exclusion

Defendant next argues that the Inactive Voter Exclusion resulted in 97,875[11] voters being excluded from consideration for the Master Wheel, which violates (1) the JSSA policy that "all citizens" shall have the opportunity to be considered for service on juries, 28 U.S.C. § 1861; and

---

[11] Defendant's expert does not differentiate between those persons improperly marked as inactive—who are residents of the county and are otherwise eligible to serve on juries—and those properly marked as inactive—who have moved from the area and failed to change their voter registration.  Martin Aff. ¶ 32.  The latter category is properly ineligible.  Therefore, the actual impact of the Inactive Voter Exclusion may be less.

(2) the JSSA requirement that "voter registration lists" be used to compile the Master Wheel. Def. Reply at 12–13. Both arguments fail. *See Allen*, 2021 WL 431458, at *10.

First, the JSSA contemplates that the lists from which the master wheel will be drawn will be imperfect and that not all citizens technically eligible to serve on juries will be considered for the master wheel: the JSSA requires voter registration lists be used, though not all citizens are registered to vote. *United States v. Cecil*, 836 F.2d 1431, 1445 (4th Cir. 1988). Similarly, refilling the wheel every four years is permissible under the JSSA, though in doing so, some otherwise eligible voters will not be considered for service on juries because they became eligible after the wheel was last refilled. *United States v. Kahn*, 472 F.2d 272, 287 (2d Cir. 1973). Therefore, though the exclusion of inactive voters and voters who become eligible during the years in between the filling of the wheel may prevent some citizens from serving on juries, it does not amount to a violation of the JSSA.

Second, even assuming that the Inactive Voter Exclusion violates the JSSA because the Master Wheel was not drawn from the full voter registration lists, Defendant nevertheless fails to demonstrate that the violation is substantial under the JSSA. Defendant argues that the exclusion "impacts the representativeness of the juries . . . because it results in the exclusion of 97,875, or nearly 7% of the jury-eligible population from consideration in the Master Wheel." Def. Reply at 11–13. To prove this impact, Defendant must show that the exclusion creates impermissible discrimination, not merely a lack of statistical randomness. *Bearden*, 659 F.2d at 602. The Government has shown that the exclusion of inactive voters decreased the percentage of Black individuals on the Master Wheel by 0.34 percentage points, and the percentage of Latinx individuals by 0.43 percentage points. Siskin Rep. ¶ 32. This does not constitute substantial

underrepresentation.  Therefore, the Inactive Voter Exclusion is not a substantial violation of the JSSA.[12]

> ### D.  Disproportionate Proration

Defendant further contends that the Disproportionate Proration violates the Jury Plan and the JSSA's requirement that "the number of names to be drawn from each county shall reasonably reflect the relative number of registered voters in each county within the respective [m]aster [j]ury [w]heels."  Jury Plan § III.A; *see also* 28 U.S.C. § 1863(b)(3).  This proration led to 285,347 registered voters not being considered for the Master Wheel, approximately 20 percent of the registered voters in the White Plains Division.  Martin Aff. ¶ 38; Def. Reply at 14 n.5.  It resulted in Putnam County being underrepresented on the Master Wheel by 0.72 percentage points, Rockland County by 2.16 percentage points, and Westchester County by 6.8 percentage points.  Martin Aff. ¶ 36.  By contrast, in the Manhattan Division, Putnam County is underrepresented on the Manhattan master wheel by 0.01 percentage points, Rockland County is overrepresented by 0.51 percentage points, and Westchester County is overrepresented by 0.13 percentage points.  *Id.*

Courts have found that geographically disproportionate representation, without evidence that it violates the fair cross-section requirement, does not constitute a substantial violation of the JSSA.  *See, e.g.*, *United States v. Orange*, 447 F.3d 792, 801 (10th Cir. 2006) ("Mere geographical imbalance as measured by a division's over[-]representation in a master jury wheel,

---

[12] Defendant's challenge could also be framed as a violation of the fair cross-section requirement, because it results in either underrepresentation of Black and Latinx individuals, or of "inactive voters" as a cognizable group.  These challenges are considered under the *Duren* test.  *Rioux*, 97 F.3d at 660.  As discussed *supra* Part II, Defendant has not made out a *prima facie* case for the former challenge.  The latter challenge would fail on the first *Duren* prong—there is no evidence that inactive voters as a group have "a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be adequately represented if the group is excluded from the jury selection process," nor that the exclusion of the group would "result in partiality or bias on the part of juries hearing cases in which group members are involved."  *United States v. Guzman*, 337 F. Supp. 140, 143–44 (S.D.N.Y.), *aff'd*, 468 F.2d 1245 (2d Cir. 1972).

absent evidence that an identifiable and cognizable segment of the community has been systematically excluded or underrepresented by reason of such imbalance, does not violate the statutory and constitutional requirement that the jury panel represent a fair cross section of the community." (alterations omitted) (quoting *United States v. Test*, 550 F.2d 577, 582 n.4 (10th Cir. 1976))); *United States v. Hawkins*, 661 F.2d 436, 442–43 (5th Cir. 1981); *United States v. Matthews*, 350 F. Supp. 1103, 1111 (D. Del. 1972). In these cases, disproportionate representation of different geographic areas of up to six percentage points was present. *United States v. Carmichael*, 467 F. Supp. 2d 1282, 1298 (M.D. Ala. 2006), *aff'd*, 560 F.3d 1270 (11th Cir. 2009).

Here, the Government's expert found that, when analyzed by the absolute disparity method, the Disproportionate Proration lowered the percentage of Black people by 0.34 percentage points, and Latinx people by 0.39 percentage points. Siskin Rep. ¶ 32. This minimal adjustment does not constitute a violation of the fair cross-section requirement, and, therefore, the geographic disproportionality on its own is not sufficient to be an actionable violation of the JSSA.[13] *See Allen*, 2021 WL 431458, at *11.

E.      Alternate Mailing Address Voters

Finally, Defendant argues that the exclusion from the Qualified Wheel of voters who did not receive an Eligibility Questionnaire, due to the technical malfunction that caused the omission of some zip codes on the Master Wheel, constitutes a violation of the JSSA. Def. Reply at 13–14. Defendant's expert states that this glitch excluded a total of 76,574 individuals from Dutchess, Orange, Putnam, and Sullivan Counties from consideration for the Qualified

---

[13] In addition, there is no violation of the fair cross-section requirement due to the exclusion of registered voters in the Overlapping Counties as a cognizable group. Geographical groupings are not cognizable under the JSSA or the Sixth Amendment. *United States v. Yonkers Contracting Co*., 682 F. Supp. 757, 768 (S.D.N.Y. 1988).

Wheel.  Martin Aff. ¶ 44.  The Government's expert calculates that the error resulted in the loss of 1,681 individuals on the Qualified Wheel, assuming that the excluded individuals would have received and answered the questionnaires at a rate consistent with other voters in the counties. Siskin Rep. ¶ 36.  The Government's expert further concludes that this exclusion actually resulted in an increase of Black individuals on the Qualified Wheel by 0.14 percentage points, and of Latinx individuals by 0.10 percentage points.  *Id*. ¶ 37.  This error, therefore, actually increased the representation of these groups on the Qualified Wheel, and did not violate the JSSA.  *See Allen*, 2021 WL 431458, at *11.

None of the defects alleged by Defendant constitute a substantial violation of the JSSA. Accordingly, the motion to dismiss the indictment as violative of the JSSA is DENIED.

## CONCLUSION

Defendant has produced clear statistical evidence of (1) underrepresentation of Black and Latinx individuals in the pool from which his grand jury was drawn, and (2) a jury selection process that was susceptible to abuse.  The Government has failed to meet its burden by coming forward with evidence rebutting the presumption that such underrepresentation was the result of purposeful discrimination.  Therefore, Defendant has established a violation of his Fifth Amendment right to a race-neutral jury selection process.  Accordingly, Defendant's motion to dismiss the indictment against him is GRANTED without prejudice to the Government's seeking the return of a new indictment pursuant to 18 U.S.C. § 3289.

The Clerk of Court is directed to terminate the motion at ECF No. 17 and to close the case.

SO ORDERED.

Dated: June 28, 2021
New York, New York

_____
ANALISA TORRES
United States District Judge